1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JULIAN SMOTHERS; ASA DHADDA,          No.  2:17-cv-00548-KJM-KJN

12                 Plaintiffs,

13          v.                              ORDER

14    NORTHSTAR ALARM SERVICES, LLC,

15                 Defendants

16

17          Plaintiffs move for leave to file a second amended complaint, preliminary approval

18    of a class action settlement, preliminary certification of proposed classes under Federal Rule of

19    Civil Procedure 23 and conditional certification of the proposed class under the Fair Labor

20    Standards Act.  The motions are unopposed.  As explained below, the court GRANTS in part and

21    DENIES in part plaintiffs' motions.

22    I.    BACKGROUND

23          A.    Factual and Procedural Background

24          Plaintiffs Julian Smothers and Asa Dhadda allege defendant NorthStar Alarm

25    Services, LLC ("NorthStar") violated California and federal law by not properly compensating

26    /////

27    /////

28    /////

                                        1

plaintiffs or providing them with mandatory wages, meal periods, rest periods, reimbursements and accurate wage statements. *See* Second Am. Compl. ("SAC"), ECF No. 45.[1]

The named plaintiffs are former NorthStar employees. *Id.* ¶¶ 1, 2, 32.[2] NorthStar specializes in home security and automation, selling, installing and servicing alarm systems throughout the United States. Motion for Preliminary Approval ("Mot."), ECF No. 39 at 11;[3] SAC ¶ 31. To establish operations in a city, NorthStar typically establishes a base of operations in a central apartment complex for its team of Alarm Installation Technicians. Mot. at 11; SAC ¶ 31. A team generally includes one Lead Alarm Installation Technician and several non-lead Alarm Installation Technicians. Mot. at 11; SAC ¶ 31. Lead Alarm Installation Technicians have oversight and inventory control duties but otherwise perform the same role as non-lead Alarm Installation Technicians. Mot. at 11; SAC ¶ 31. All technicians typically report for a morning meeting to review training before traveling into the field to complete alarm installation assignments. Mot. at 11; SAC ¶ 19. After completing assignments, technicians report to the central base of operations to turn in paperwork and account for inventory. Mot. at 11; SAC ¶ 21. NorthStar compensates technicians in part through "a piece rate based on alarm installations." Mot. at 12; SAC ¶ 21. Plaintiffs contend this compensation scheme deprives technicians of "a separate . . . hourly compensation for time spent in 'non-productive' tasks . . . . such as attending morning meetings, traveling out into the field, waiting in the field between installation jobs, correcting installations, or turning in forms and accounting for inventory at the end of the day." Mot. at 12; SAC ¶¶ 21.

---

[1] Plaintiffs initially filed a proposed second amended complaint that contained several errors and inconsistences, many of which the court identified at hearing. *See* ECF No. 39, Ex. 1. At the court's prompting, and after meeting and conferring with defendants, plaintiffs submitted the current proposed second amended complaint, which the court accepts and cites throughout this order.

[2] The second amended complaint refers to Dhadda as both "a current" NorthStar employee, ¶ 32, and "a former" NorthStar employee, ¶ 2. Dhadda confirmed in a recently filed declaration that he is no longer a NorthStar employee. ECF No. 54-2 ¶ 7.

[3] The court cites specific paragraph numbers as those numbers are provided in declarations and the settlement agreement, but cites ECF page numbers in referring to the briefs.

Plaintiffs filed this putative wage and hour class action complaint in state court alleging NorthStar violated various provisions of the California Labor Code and the federal Fair Labor Standards Act ("FLSA"). Compl., ECF No. 1, Ex. A. NorthStar removed the action to this court, ECF No. 1, and, following discovery, plaintiffs moved to amend their complaint, ECF No. 28, and then moved for preliminary certification of their FLSA collective action, ECF No. 33. Before the court decided plaintiffs' motion to amend, which was fully briefed and taken under submission, *see* ECF Nos. 28-29, 31-32, and before the motion for conditional certification was fully briefed, *see* ECF No. 33, the parties reached a settlement agreement, *see* ECF No. 35 (Settlement Notice); *see also* Joint Stipulation of Class Action Settlement and Release ("Settlement), Jared Hague Decl., ECF No. 39-2, Ex. 1 at 11-74. Upon the parties' request, the court continued the pending FLSA certification motion in anticipation of the instant motion. *See* ECF No. 36 (Second Am. to Scheduling Order). At hearing, with S. Brett Sutton and Jared Hague appearing for the plaintiffs and Andrew Collins appearing for the defendant, both parties agreed the instant motion moots plaintiffs' motion to amend and motion for conditional certification. *See* Transcript ("Tr."), ECF No. 47 at 2:21-3:7.

B.     Settlement Agreement

The parties reached a settlement agreement following mediation with a former judge and experienced wage and hour class action mediator. Mot. at 28; Jared Hague Decl. ¶ 18.[4] Critical components of the proposed settlement are addressed below.

1.     Proposed Classes

Given significant differences between Rule 23 class actions and FLSA collective actions, the parties' settlement agreement proposes two settlement classes with separate settlement funds, though both classes span the same February 3, 2013 through December 31, 2017 class period. *See* Settlement §§ I.4 & I.9; Fed. R. Civ. P. 23(a)-(b), (e); 29 U.S.C. § 216(b).

/////

/////

---

[4] The court has conducted an in camera review of the parties' confidential mediation briefs and the mediator's global settlement proposal.

The parties propose the following class definitions:

> California Class: All current and former non-exempt Alarm Installation Technicians and Lead Alarm Installation Technicians who performed compensable work for Defendant in the State of California at any time from February 3, 2013 through December 31, 2017, as defined herein.

Settlement § I.4.a.

> FLSA Group: All current and former non-exempt Alarm Installation Technicians and Lead Alarm Installation Technicians who performed compensable work for Defendant in the United States at any time from February 3, 2014 through December 31 [sic] 2017, as defined herein, and who affirmatively opt in to the Settlement by cashing, depositing, or otherwise negotiating a Settlement Payment Check.

*Id.* § I.4.b. NorthStar has identified all putative class members through its records, Mot. at 13, and confirms there are 94 individuals in the California Class and 285 individuals in the FLSA Group, Settlement § I.4.a.-b.

### 2. Proposed Gross Settlement Amount[5]

Under the Agreement, NorthStar will make a $1.8 million gross settlement payment to the settlement administrator. Settlement §§ I.21 ("Gross Settlement Amount"), V.2 ("Payment by Defendant"). The parties propose the following allocation of the gross settlement amount:

> (1) Up to $600,000, one-third of the gross settlement, for class counsel as attorneys' fees, and up to $20,000 for costs and expenses. Id. § IV.7. Any difference in the amount actually awarded will revert to the net settlement fund for distribution to class members. Id.

> (2) Up to $10,000 in enhancement payments for each named plaintiff. Id. § IV.2. Any difference in the amount actually awarded will revert to the net settlement fund for distribution to class members. Id.

> (3) An anticipated $40,000 in administrative expenses paid to the claims administrators. Additional expenses will be deducted from the gross settlement amount, with the net settlement and class

---

[5] The Settlement erroneously states that Class funds will be paid directly from the Gross Settlement Amount. *Compare* Settlement § I.21 (allocating 100% of gross settlement amount to California Class and FLSA Group)*, with* Settlement § I.25 (allocating 100% of net settlement amount, after costs, fees and awards are deducted from the gross settlement amount, to the classes). At hearing counsel confirmed the Settlement language defining the gross settlement amount is erroneous and the class funds will be distributed from the net, not gross, settlement as provided in § I.25.

4

members' awards recalculated accordingly, upon approval from the court. Id. § VI.1. If expenses are less than $40,000, the excess will be added to the net settlement amount prior to distribution to class members. Id.

(5) A $50,000 California Private Attorneys General Act of 2004 ("PAGA") penalty, 75 percent ($37,500) of which will be paid to the California Labor and Workforce Development Agency and 25 percent ($12,500) of which will be paid to the class. Id. § VII.1.e.

(6) Any applicable tax withholding required. Id. §§ IV.5; VII.1.d.

### 3. Proposed Net Settlement Amount

Accounting for all proposed distributions described above, plaintiffs estimate a $1,082,500 net settlement available for distribution to class members. *See* Mot. at 13; *see also* Settlement § I.25. The parties propose allocation of the net settlement amount as follows:

### a. California Class Settlement Amounts

The California Class will receive an allocation of 44 4/9 percent ($481,111) of the net settlement amount. Settlement § I.25. This amount will be divided by 1,275, the total number of California Class Members' workweeks, resulting in a "pay period rate." Settlement § VII.2.a. Each California Class member who does not opt-out of the settlement will receive a settlement amount equal to the number of his or her individual weeks worked between February 3, 2013 and December 31, 2017, multiplied by the pay period rate. *Id.*

If more than 30 percent of California Class members opt-out, however, the parties agree the portion of the net settlement amount allocated to the California Class that would have been paid to the excluded individuals be returned to NorthStar. *Id.* § VI.4. Should fewer than 30 percent of the California Class opt out of the settlement, the net settlement amount will not be reduced. *Id.*

### b. FLSA Group Settlement Amounts

The FLSA Group will receive an allocation of 55 5/9 percent ($601,389) of the net settlement amount. *Id.* § I.25. The FLSA Group's share of the net settlement amount will be divided by 5,769, the FLSA Group members' total number of workweeks, resulting in a pay period rate. *Id.* § VII.2.b. Each FLSA Group member will receive a settlement amount equal to

/////

the number of his or her individual weeks worked between February 3, 2014 and December 31, 2017, multiplied by the pay period rate. *Id.*

Should a member of the FLSA Group decline to opt-in to the settlement, the administrator will return the member's settlement funds to NorthStar. Settlement § VII.6. But NorthStar guarantees payment of at least 50 percent of the FLSA Group allocation to FLSA Group members and, if necessary to meet that 50 percent commitment, a cy pres recipient. § VI.5. The parties propose the Justice Gap Fund of the State Bar of California as a cy pres recipient. Id.

### 4. Non-Monetary Settlement

The settlement also includes non-monetary terms, including NorthStar's agreement to make changes to its compensation practices. Settlement § IV.4. These changes include requiring NorthStar to record the daily hours worked by class members to ensure correct wage payments; paying Alarm and Lead Alarm Installation Technicians at least California minimum wage and overtime wages for all hours worked; posting and distributing meal and rest period bulletins; modifying on-call policies applicable to California Alarm and Lead Alarm Installation Technicians so those employees are not required to monitor their phones during off-duty hours or during meal and rest periods; and Reimbursing California Alarm and Lead Alarm Installation Technicians for reasonable business expenses, including reimbursement for required tools and for work-related travel conducted in personal vehicles at the IRS mileage rate. *Id.* § III.4.a–e.

On March 19, 2018, as required under the parties' settlement terms, NorthStar filed a declaration confirming it has taken all non-monetary action required under the Settlement. ECF No. 41.

## II. PRELIMINARY CLASS CERTIFICATION

### A. California Class

Plaintiffs seek preliminary certification of the proposed California Class for settlement purposes and preliminary settlement approval under Rule 23. Mot. at 20-29. Rule 23 permits class action settlements "only with the court's approval" following "a hearing and on a finding" that the agreement is "fair, reasonable, and adequate." Fed. R. Civ. P 23(e). Proposed

6

class action settlements are reviewed in two stages, requiring two hearings. First, the court conducts a preliminary fairness analysis and, if necessary, a preliminary class certification analysis. Ann. Manual for Complex Litigation, Fourth, (May 2018 Update) ("MCL"), § 21.632; *see In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Second, after all absent class members are notified of the certification and proposed settlement, the court holds a final fairness hearing where it revisits class certification and determines whether to approve the settlement. MCL §§ 21.632-21.635 (4th ed.); *Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1267 (9th Cir. 2010).

Preliminary certification in the settlement context is appropriate only if Rule 23's certification requirements are satisfied. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (court owes "undiluted, even heightened, attention" to class certification requirements in settlement context); Fed. R. Civ. P. 23(c)(1) advisory committee's note to 2003 amendment ("A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met."). The court reviews each Rule 23 requirement below.

### 1. Rule 23(a)(1) – Numerosity

The class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Joinder need not be impossible; rather, "the court must find that the difficulty or inconvenience of joining all members of the class makes class litigation desirable." *In re Itel Sec. Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981); *accord Baghdasarian v. Amazon.com, Inc.*, 258 F.R.D. 383, 388 (C.D. Cal. 2009) (defining "impracticability" as when joinder of all class members is "difficult or inconvenient") (citations omitted). "While there is no fixed number that satisfies the numerosity requirement, as a general matter, a class greater than forty often satisfies the requirement, while one less than twenty-one does not." *Johnson v. Serenity Transportation, Inc.*, No. 15-CV-02004-JSC, 2018 WL 3646540, at *6 (N.D. Cal. Aug. 1, 2018) (quoting *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 526 (N.D. Cal. 2012)).

Here, the California Class consists of 94 technicians, and plaintiffs reasonably contend it would be impracticable to bring 94 individual suits. Mot. at 20. The numerosity requirement is satisfied.

## 2. Rule 23(a)(2) – Commonality

To satisfy the commonality requirement, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The "claims must depend upon a common contention . . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The court considers "the capacity of [the] classwide proceeding to generate common answers" and takes note of "[d]issimilarities within the proposed class [] [that] have the potential to impede the generation of common answers." *See Millan v. Cascade Water Servs., Inc.*,310 F.R.D. 593, 604 (E.D. Cal. 2015) (quoting *Dukes*, 564 U.S. at 350).

"Commonality is generally satisfied where . . . 'the lawsuit challenges a system-wide practice or policy that affects all of the putative class members.'" *Franco v. Ruiz Food Prods., Inc.*, No. CV 10-02354 SKO, 2012 WL 5941801, at *5 (E.D. Cal. Nov. 27, 2012) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005))

In their motion for preliminary certification, plaintiffs barely even attempt to establish that the commonality requirement is satisfied here. *See* Mot. at 20 (arguing, in light of the parties' settlement, the California Class members' "employment with Defendants [sic] as an Alarm Installation Technician during the Class Period" satisfies the commonality requirement). Plaintiffs' revised second amended complaint provides better support and, given the nature of the class claims and definition of the class, the court finds the commonality requirement is satisfied at this preliminary stage. *See* SAC ¶ 26 (identifying 15 common questions of law and fact). Specifically, the common questions of law and fact raised in plaintiffs' proposed second amended complaint will generate class-wide answers to the following central issues in this matter: whether NorthStar's piece-rate payment policy violates California's minimum wage laws by denying class members minimum wage for travel time between employment locations, waiting time, on-call time and time spent in meetings and repairing defective alarm systems; whether the piece-rate policy violates California law entitling class members to overtime and double time wages; whether

NorthStar's written meal period policy did not accurately describe class members' entitlement to a first and second, duty-free meal break, and whether requirement that class members monitor their phones at all times denied class members meal breaks; whether NorthStar's absence of a rest period policy and requirement that class members monitor their phones at all times deprived class members of ten-minute, duty-free rest periods; whether NorthStar provided plaintiffs with accurate pay records; and whether NorthStar's requirement that class members have certain mandatory equipment, without reimbursing class members for that equipment, violated California law. *Id.* ¶¶ 21-26(a)–(o). Each of these questions implicates NorthStar's uniform compensation system and policies to which all class members were subject, and presents common questions "central to the validity of each one of the claims" and "capable of class-wide resolution." *See Dukes*, 654 U.S. 350. At this juncture, plaintiffs have satisfied the commonality requirement.

### 3. Rule 23(a)(3) – Typicality

The typicality requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Measures of typicality include 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Under this "permissive" requirement, "representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

Here, plaintiffs allege they, along with all class members, were "uniformly subject to the same" NorthStar policies for compensation, received the same itemized wage statements, "generally followed a similar daily routine during the summer season," and were "subject to the same [NorthStar] written policies and procedures." SAC ¶ 27. Plaintiffs thus allege their "claims are typical of the class claims." *Id.* As discussed above, plaintiffs have identified NorthStar policies that presumably deprived technicians across the California Class of required compensation and rest

and meal breaks.  For present purposes, there is no indication the named plaintiffs' claims differ substantively from those of the class and it appears NorthStar's policies likely resulted in similar injuries across the class.  Accordingly, at this juncture, the typicality requirement is satisfied.

### 4.    Rule 23(a)(4) – Adequacy

The adequacy requirement is satisfied only if the representative plaintiffs "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Courts must consider whether "(1) [] the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) [] the named plaintiff and their counsel [will] prosecute the action vigorously on behalf of the class[.]" *Hanlon*, 150 F.3d at 1020.  "Serious conflicts of interest can impair adequate representation by the named plaintiffs, yet leave absent class members bound to the final judgment, thereby violating due process." *In re Volkswagen 'Clean Diesel' Mktg., Sales Practices, & Prod. Liab. Litig.*, 895 F.3d 597, 607 (9th Cir. 2018).

While both named plaintiffs seek a relatively high incentive award, which the court addresses below, the record before the court does not suggest the named plaintiffs have conflicts of interest with the putative class members.  Further, plaintiffs have participated in the litigation process, *see* Hague Decl. ¶ 17, and their claims and interests appear to be "aligned with [those] of the class," *Collins v. Cargill Meat Sols. Corp.*, 274 F.R.D. 294, 301 (E.D. Cal. 2011).  With respect to the second factor, plaintiffs' counsel have described their significant collective experience in class-action cases and, specifically, in class-action cases involving employment related matters. *See* S. Brett Sutton Decl. ¶¶ 5-13; Jared Hague Decl. ¶¶ 11-13.  Plaintiffs' counsel also describe the effort expended on this action thus far, which includes extensive discovery, investigation into the strengths and weaknesses of the class claims and participation in private mediation with a highly experienced mediator.  *See* Jared Hague Decl. ¶ 14.  At this juncture, the court finds the class representatives and counsel are adequate.

### 5.    Rule 23(b)(3) – Predominance & Superiority

Plaintiffs contend the California Class should be certified under Rule 23(b)(3), under which the court must find: "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is

superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see* Mot. at 22-23. In conducting the predominance and superiority inquiries, courts may consider Rule 23(b)(3)'s "non-exclusive factors":

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D); *Hanlon*, 150 F.3d at 1023.

a.    <u>Predominance</u>

"The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation and internal quotation marks omitted); *Amchem*, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.") (citation omitted). Thus, the court considers "the relationship between the common and individual issues." *Hanlon*, 150 F.3d at 1022.

Here, as noted above, the major questions in this case arise from NorthStar's alleged uniform failure to properly calculate wages and overtime, account for meal periods and rest periods, and provide reimbursements. *See* Mot. at 23. While the court may not "rely on uniform policies 'to the near exclusion of other relevant factors touching on predominance,'" the current record establishes these policies were applied to all putative California Class members, who performed the same job functions in the same ways, with no evidence that variance from these policies or other "fact-intensive" determinations would prevent the identified major questions from predominating in this litigation. *See Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 965 (9th Cir. 2013) (citations omitted).

/////

b.     <u>Superiority</u>

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case," which "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon*, 150 F.3d at 1023 (citation omitted). The available alternative resolution here would require the 94 class members to bring individual claims to resolve the same questions at the heart of this action while bearing the full "cost of litigation, including the inevitable cost of expert witnesses if the matter went to trial . . . ." *See* Mot. at 23. Although plaintiffs contend the costs of individual suits "would far outstrip the potential recovery on an individual basis," they do not provide the court with an estimate of the average recovery per class member. *See id.* Taking the net settlement amount estimated for the California Class, $481,111, and dividing that figure by the number of putative class members, 94, an average payment to each class member would be $5,118.20. That figure will vary depending on each class member's total number of workweeks. *See id.* at 13 (explaining class members' settlement amounts will be "based on the total number of workweeks worked"). Thus, it is not entirely clear to the court that this sum is so insignificant as to make all individual suits pointless, though it seems likely that some class members' costs of suit would likely outweigh their recovery. *Cf. Kempen v. Matheson Tri-Gas, Inc.*, No. 15-CV-00660-HSG, 2016 WL 4073336, at *7 (N.D. Cal. Aug. 1, 2016) (finding estimated recovery of $50 for one class and $500 for the other "suggest that the incentive to litigate any individual claim is low and that class treatment is superior"). At this stage and without any suggestion that individual members have a strong interest in the piecemeal pursuit of individual claims arising from uniform policies, the class action mechanism will promote efficiency by allowing multiple claims to be litigated simultaneously and is thus provides the superior method.

At this preliminary stage, plaintiffs have satisfied Rule 23(a) and 23(b)(3)'s requirements and the motion to preliminarily certify the California Class is GRANTED.

*/////*

*/////*

*/////*

6.   Appointment of Class Counsel

Under Rule 23(g), "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). Here, as addressed above, plaintiffs' counsel have experience litigating wage and hour class actions and their request to be appointed class counsel is GRANTED.

B.   The FLSA Group

The FLSA establishes an opt-in collective action procedure for employees allegedly denied wages and overtime pay. *See* 29 U.S.C. § 216(b). Under the FLSA, "one or more employees" may file a civil action "in behalf of himself or themselves and other employees similarly situated." *Id.*

The FLSA does not define the term "similarly situated" and the Ninth Circuit only recently, and only after this motion was submitted, interpreted that term. *See Campbell v. City of Los Angeles*, 903 F.3d 1090, 1110–17 (9th Cir. 2018). After rejecting the "minority approach" among district courts, which "treat[ed] a collective as an opt-in analogue to a Rule 23(b)(3) class," the panel also declined to wholly adopt the majority "ad hoc" approach, which "applies a three-prong test that focuses on points of potential factual or legal dissimilarity between party plaintiffs." *Id.* at 1111–13 (emphasis omitted). The panel faulted the latter approach for "offer[ing] no clue as to what kinds of 'similarity' matter under the FLSA," and its "open-ended inquiry into the procedural benefits of collective action [that] invites courts to import, through a back door, requirements with no application to the FLSA." *Id.* at 1113-16. Rather, considering the term "similarly situated" in light of the FLSA's goals, the panel explained:

> [The FLSA's] goal is only achieved—and, therefore, a collective can only be maintained—to the extent party plaintiffs are alike in ways that matter to the disposition of their FLSA claims. If the party plaintiffs' factual or legal similarities are material to the resolution of their case, dissimilarities in other respects should not defeat collective treatment.

*Id.* at 1114 (internal citations and emphasis omitted). Thus, "[p]arty plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Id.* at 1117.

/////

13

*Campbell* also approved of district courts' two-step approach for determining whether a FLSA collective action may proceed. *Id.* at 1108-10. In the first step, as here, the plaintiff moves for preliminary certification and the district court applies a "lenient [standard] . . . . loosely akin to a plausibility standard," with the analysis "focused on a review of the pleadings but [] sometimes [] supplemented by declarations or limited other evidence." *Id.* at 1109. If granted, "preliminary certification results in the dissemination of a court-approved notice to the putative collective action members, advising them that they must affirmatively opt in to participate in the litigation." *Id.* In the second step, typically following discovery, the employer may move for decertification, showing the "similarly situated" requirement has not been satisfied, prompting the court to "take a more exacting look at the plaintiffs' allegations and the record." *Id.*

Here, plaintiffs contend the FLSA Group members are similarly situated because that group "consists exclusively of Lead and regular [sic] Alarm Installation technicians," all of whom "were compensated in the same manner" under NorthStar's compensation policies "and were allegedly denied overtime and minimum wages . . . ." Mot. at 17–18; *see* SAC ¶¶ 21–23, 111-30. Further, in their prior motion to preliminarily certify the FLSA class, plaintiffs submitted declarations from NorthStar technicians who worked in various locations across the country and attested that in each location they were subject to NorthStar's policies that give rise to the FLSA minimum wage and overtime claims at issue here. *See* Gerry Sarabia Decl., ECF No. 33-5 (employed as technician in California, Indiana, Texas, Washington, Illinois); Asa Dhadda Decl., ECF No. 33-6 (employed as technician in California, Indiana, Colorado, Texas, Oklahoma, Illinois); Armando Gomez, Jr. Decl., ECF No. 33-7 (employed as technician in California, Texas, Nevada). Thus, at this preliminary stage, there is sufficient evidence that the putative "party plaintiffs are alike in ways that matter to the disposition of their FLSA claims," as they held similar jobs with similar functions and were uniformly subject to NorthStar's compensation policies that led to the alleged FLSA violations here, presenting "similar issue[s] of law or fact material to the disposition of their FLSA claims." *Campbell*, 903 F.3d at 1117; *see Kempen v. Matheson Tri-Gas, Inc.*, No. 15-CV-00660-HSG, 2016 WL 4073336, at *4 (N.D. Cal. Aug. 1, 2016) (conditionally certifying FLSA class where complaint alleged "non-exempt delivery drivers were subject to a

14

common policy instituted by Defendant that did not factor in bonus pay into the putative class's overtime pay rate").

For the foregoing reasons, the motion to preliminarily certify the FLSA Group is GRANTED.

III.    PRELIMINARY SETTLEMENT APPROVAL

Under Rule 23(e), a class action may be settled "only with the court's approval," and the court may provide such approval "only after a hearing and only on finding that it is fair, reasonable, and adequate . . . ." Fed. R. Civ. P. 23(e).  To assess the fairness of a proposed settlement, courts consider several factors, including:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and view of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015) (quoting *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).  While class action settlements always "present unique due process concerns for absent class members" and the "inherent risk [] that class counsel may collude with the defendants," settlements negotiated prior to class certification present "an even greater potential for a breach of fiduciary duty owed the class during settlement."  *In re Bluetooth*, 654 F.3d at 946 (citations and internal quotation marks omitted).  Such settlements "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."  *Id.* (citing *Hanlon*, 150 F.3d at 1026).  Should the court find the settlement deficient, it "may suggest changes" but cannot "rewrite" a settlement agreement.  M.C.L. § 13.14 (footnotes omitted); *Hanlon*, 150 F.3d at 1026 (court reviews "the settlement taken as a whole, . . . for overall fairness"; "[t]he settlement must stand or fall in its entirety" (citing *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982)).

"FLSA claims may not be settled without approval of either the Secretary of Labor or a district court."  *Seminiano v. Xyris Enter., Inc.*, 602 F. App'x 682, 683 (9th Cir. 2015) (citing

*Nall v. Mal-Motels, Inc.*, 723 F.3d 1304, 1306 (11th Cir. 2013)). In the absence of Supreme Court or Ninth Circuit guidance, district courts in this circuit often apply the Eleventh Circuit's standard in evaluating FLSA settlements, assessing whether the settlement is "a fair and reasonable resolution of a bona fide dispute over FLSA provisions." *See Lynn's Food Stores, Inc. v. U.S. by & through U.S. Dep't of Labor, Employment Standards Admin., Wage & Hour Div.*, 679 F.2d 1350, 1355 (11th Cir. 1982); Mot. at 18 (applying same standard). "A bona fide dispute exists when there are legitimate questions about 'the existence and extent of Defendant's FLSA liability.'" *Selk v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1172 (S.D. Cal. 2016) (quoting *Ambrosino v. Home Depot. U.S.A., Inc.*, No. 11cv1319 L(MDD), 2014 WL 1671489 (S.D. Cal. Apr. 28, 2014)). In conducting this inquiry, courts often turn to factors relied on in preliminary certification of Rule 23 class actions to the extent those factors apply to FLSA actions. *Maciel v. Bar 20 Dairy, LLC*, No. 117CV00902DADSKO, 2018 WL 5291969, at *4 (E.D. Cal. Oct. 23, 2018) (citing *Khanna v. Inter-Con Sec. Sys., Inc.*, No. CIV S-09-2214 KJM, 2013 WL 1193485, at *2 (E.D. Cal. Mar. 22, 2013)).

### A.  Obvious Deficiencies

At the preliminary approval stage, courts often consider only whether the proposed settlement "(1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval." *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 319 (C.D. Cal. 2016) (citations omitted). To the extent this analysis may be less rigorous than the *Churchill* inquiry described above, the court is persuaded by a colleague's observation that "the idea that district courts should conduct a more lax inquiry at the preliminary approval stage seems wrong" and lacks any compelling rationale. *See Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1035–36 (N.D. Cal. 2016). Rather, in light of the court's duty to absent class members, the court should "review class action settlements just as carefully at the initial stage as [it] do[es] at the final stage." *See id.* at 1037.

Here, however, even a less-than-rigorous analysis reveals "obvious deficiencies" in the settlement that preclude preliminary approval. Namely, the proposed FLSA notice and opt-in

procedures are fatally flawed.  Upon this court's preliminary approval but prior to its final approval, the parties agree to sending each putative FLSA Group member a check for his or her individual settlement amount, with each check containing the following endorsement:

> By signing, depositing, and/or cashing this check, I hereby consent to opt-in to the collective action in *Smothers et al. v. NorthStar Alarm Services, LLC*, Case No. 2: 17-cv-00548-KJM-KJN (E.D. Ca.) [sic] as a party plaintiff pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA") and agree to release NorthStar Alarm Services, LLC ("NorthStar") and all Released Parties from all claims, both known and unknown, that arise out of my employment with NorthStar under the FLSA, state statutory law (excluding workers' compensation laws, unemployment compensation laws, and discrimination laws), or common law (e.g., unjust enrichment, quantum meruit, etc.) concerning my compensation, hours of work, pay for those hours of work, or NorthStar's payroll practices.[6]

Settlement §§ VI. 2, VII. 2.  But § 216(b) of the FLSA expressly provides that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."  29 U.S.C. § 216(b).  Courts more elevated than this one have read the statutory language as requiring written consent filed with the court, albeit not in formal holdings.  *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013) ("The sole consequence of conditional certification is the sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court, § 216(b).") (citation omitted); *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1043 (2016) (quoting same to explain why "[t]he size of the class certified under Rule 23 [] was larger than that certified under § 216"); *Rangel v. PLS Check Cashers of California, Inc.*, 899 F.3d 1106, 1109 n.1 (9th Cir. 2018) ("A [FLSA] collective is not formed until other plaintiffs file consent

---

[6] In addition to the other problems with the endorsement opt-in approach discussed below, this release language appears inconsistent with the language provided in the parties' settlement agreement, which plaintiffs emphasize is "appropriately tailored" and "releases only those claims which were or could have been asserted based on the allegations in Plaintiffs' proposed second amended complaint, and which arose during the Class Period."  Mot. at 16 (emphasis omitted); Settlement § I.30 ("Released Claims").  District courts appropriately "routinely reject proposed class action settlement agreements that try to release all claims in a wage-and-hour case relating to compensation as overbroad and improper."  *Kempen v. Matheson Tri-Gas, Inc.*, No. 15-CV-00660-HSG, 2016 WL 4073336, at *9 (N.D. Cal. Aug. 1, 2016) (collecting cases).

forms with the court joining (that is, 'opting into') the original named plaintiff's case.") (citations omitted)).

Plaintiffs contend their proposed method of opting-in "has been approved by other courts." Mot. at 19 (citations omitted).[7] They are correct, but the decisions they point to are less than satisfying on the crucial question here. One case expressly finds "both the Notice Packet and the check accompanying it sufficiently inform Class Members of their option not to opt in by not cashing the check," *Viceral v. Mistras Grp., Inc.*, No. 15-CV-02198-EMC, 2016 WL 5907869, at *10 (N.D. Cal. Oct. 11, 2016), but the court there does not appear to have analyzed whether the check-cashing method complied with the requirement of "consent in writing to become such a party . . . filed in the court in which such action is brought." 29 U.S.C. § 216(b). In other cases plaintiffs cite, courts approved the proposed check-cashing opt-in method with no citation whatsoever to § 216(b)'s opt-in language. *See Lazarin v. Pro Unlimited, Inc.*, No. C11-03609 HRL, 2013 WL 3541217, at *2 (N.D. Cal. July 11, 2013); *Franco*, 2012 WL 5941801, at *24; *del Toro Lopez v. Uber Techs., Inc.*, No. 17-CV-06255-YGR, 2018 WL 5982506, at *25 (N.D. Cal. Nov. 14, 2018). Plaintiffs also cite cases where the court required employees to first return an opt-in form before receiving settlement checks with opt-in endorsement language, which provides little if any support for plaintiffs' position that cashing a settlement check alone suffices. *See Leverage v. Traeger Pellet Grills, LLC*, No. 16-CV-00784-KAW, 2017 WL 2797811, at *4 (N.D. Cal. June 28, 2017); *Nur v. Tatitlek Support Servs., Inc.*, No. 15CV00094SVWJPRX, 2016 WL 3039573, at *3 (C.D. Cal. Apr. 25, 2016). Plaintiffs' remaining cases either approve the check-cashing opt-in method in cases initially filed as "hybrid" FLSA and Rule 23 class actions, as here, without any reasoned explanation for dispensing with § 216(b)'s requirements, or are ambiguous as to whether FLSA members initially filed written consent with the court. *See Gundrum v. Cleveland Integrity Servs., Inc.*, No. 17-CV-55-TCK-TLW, 2017 WL 3503328, at *3 n.2 (N.D. Okla. Aug. 16, 2017) (noting settlement stipulating to "certification of a multi-state Rule 23 settlement class," although endorsement language on check includes release of FLSA claims); *Mills v. Capital One, N.A.*, No.

---

[7] Plaintiffs filed notices of supplemental authority for this position after this motion was submitted. *See* ECF Nos. 46, 54. The court has considered both submissions.

14 CIV. 1937 HBP, 2015 WL 5730008, at *1, 6-7 (S.D.N.Y. Sept. 30, 2015) (approving distribution of settlement checks to release FLSA claims only after earlier notice advised of "the right of members of the class to opt in to the collective action" and only after court's final approval).

The court has considered whether § 216(b)'s requirement may be satisfied by virtue of the parties' agreement to have the Settlement Administrator "maintain copies of all negotiated checks . . . and file with the Court at least 14 days prior to the Final Approval and Fairness Hearing, a declaration at the conclusion of the check-cashing period listing the names . . . of all Class Members who signed, deposited, and/or cashed their settlement checks" along with "redacted copies of the cashed checks." Settlement § VII.2.b. This procedure would provide a type of writing filed with the court, and § 216(b) could be read to allow as much. But such a reading is strained, given the Supreme Court's reading of the statute as requiring not merely any form of opting-in, but written consent filed with the court. *See Genesis Healthcare Corp.*, 569 U.S. at 75 (employees "become parties to a collective action only by filing written consent with the court"). In contrast, the parties' proposal would have FLSA collective active members opt-in and receive their settlement in a single stroke and prior to the court's final settlement determination. Plaintiffs provide no justification for distributing settlement funds before the settlement has been finally approved. While the parties anticipate "issu[ing] a second check to each FLSA Group Member" should the court's final approval result in a higher than estimated net settlement, they have no plan in place should the court withhold final approval, and thus appear to take for granted the court's final approval is guaranteed. *See id.* ¶ VII.2.c. But it cannot be if the court is to do its job, as it will.

This court thus joins those that have consulted § 216(b)'s requirements and rejected similar opt-in by settlement check proposals. *See Johnson v. Quantum Learning Network, Inc.*, No. 15-CV-05013-LHK, 2016 WL 8729941, at *1 (N.D. Cal. Aug. 12, 2016) (finding settlement provision allowing FLSA members to opt-in by cashing or depositing settlement checks "does not comply with the plain language of the FLSA" and constitutes an obvious deficiency that precludes preliminary approval of Rule 23 and FLSA settlement); *Kempen v. Matheson Tri-Gas, Inc.*, No. 15-CV-00660-HSG, 2016 WL 4073336, at *9 (N.D. Cal. Aug. 1, 2016) (same); *Robinson v.*

*Flowers Baking Co. of Lenexa, LLC*, No. 16-2669-JWL, 2017 WL 4037720, at *1 n.1 (D. Kan. Sept. 13, 2017) (same). *Cf. Ferreri v. Bask Tech., Inc.*, No. 15-CV-1899-CAB-MDD, 2016 WL 6833927, at *2 & n.1 (S.D. Cal. Nov. 21, 2016) (finding plaintiff's counsel's declaration "listing 35 individuals who she claims submitted their consent to join the conditional collective action" does not satisfy FLSA's opt-in requirement).

Because the court must approve of or reject the settlement in its entirety, this defect requires the court to DENY the motions to approve both the Rule 23 and FLSA settlements here. As other courts have noted, it appears one way the parties may correct this deficiency is by directing putative FLSA Group members to send opt-in forms to the settlement administrator and then having plaintiffs file those opt-in forms with this court. *Johnson,* 2016 WL 8729941, at *1; *Kempen*, 2016 WL 4073336, at *9.

In the event plaintiffs renew their motion with a proposed cure to the FLSA opt-in problem, the court reviews certain remaining factors based on the current record.

### B. Remaining Factors

At hearing on this motion, the court requested the parties submit their confidential mediation briefs for in camera review. The court has now reviewed those briefs and considers them in addressing whether the settlement is fair and reasonable, not making any determination as to the merits of plaintiffs' claims, but in light of the strengths and weaknesses of plaintiffs' case given the risk and expense of continued litigation and the risk of maintaining class action status throughout the trial. Plaintiffs' claims are largely premised on NorthStar's employment policies, or deficiencies within those policies, which plaintiffs contend violated the law and were applied uniformly to technicians. *See* Mot. at 25–26. Based on its review of the relevant records, plaintiffs provide a $1.16 million estimate of NorthStar's total potential liability for the California minimum wage and overtime claims alone. Hague Decl. ¶¶ 21-22. But to recover at least $500,000 of that estimate, plaintiffs would need to show NorthStar's willfulness, *id.* ¶ 22, and they contend "[d]iscovery to date does not support the conclusion that Defendant's alleged violation was willful or intentional," Mot. at 25. Moreover, plaintiffs cite as additional weaknesses justifying compromise the absence of certain records, the existence of non-binding but persuasive adverse

case law addressing similar facts and potential challenges to class certification. *Id.* In their filings supporting the instant motion, plaintiffs contend these concerns likewise motivated their compromise on the derivative California Labor Code §§ 203, 226 claims, which plaintiffs say they estimated to be worth $127,000 and $318,000, respectively, and their meal and rest period claims, for which they estimated NorthStar's exposure to be $174,000. *Id.* at 27; Hague Decl. ¶¶ 24, 26. Their California reimbursement claims, for which plaintiffs estimate NorthStar is liable for $35,000, and travel expenses claims, with NorthStar's liability estimated at $100,000, required compromise due to missing records and difficulties in proof. *Id.* ¶ 25. Continued litigation would involve significant expense, as plaintiffs would be required to certify the class, continue discovery and obtain "extensive expert analysis and representative evidence . . . to address various problems of proof." *Id.* ¶ 19; *see also id.* ¶ 22 (noting plaintiffs would attempt to use representative evidence to establish common questions of law or fact predominate under standard outlined in *Tyson*, 136 S. Ct. at 1047, to overcome absent records). Plaintiffs estimate their FLSA overtime and minimum wage claims' value at $732,000 and $40,000, respectively, noting these figures account employers' ability to average compensation "on a workweek basis" under federal law, potentially weakening plaintiffs' claims. *Id.* ¶ 12. In light of these weaknesses and considering the additional expenses to be incurred in continued litigation, plaintiffs eventually concluded that the mediator's proposed $1,800,000 global settlement was fair and reasonable. *Id.* ¶ 28. At this juncture, the court agrees.

As to the balance of factors, the court finds no major impediments to approval. Plaintiffs attest to robust discovery preceding settlement. Specifically, plaintiffs cite both formal and informal discovery where the parties exchanged and reviewed "thousands of documents." Hague Decl. ¶¶ 14, 21. Settlement ultimately resulted from "a highly contentious litigation process and multiple arms length [sic] negotiations with opposing counsel, including a private mediation with . . . a former litigator and judge known for his expertise in the law surrounding complex California wage and hour class actions." *Id.* ¶ 18; *see Pierce v. Rosetta Stone, Ltd.*, No. C 11–01283 SBA, 2013 WL 1878918, at *5 (N.D. Cal. 2013) (means by which parties reached proposed settlement bears on its reasonableness and fairness). Indeed, although the parties left mediation

/////

without reaching settlement, they "remained in constant contact" with the mediator and ultimately accepted his "global mediator's proposal . . . ." Hague Decl. ¶ 28.

### C. Subtle Signs of Unfairness

When, as here, a settlement is negotiated before formal class certification, the court must carefully review the settlement for "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947 (citations omitted). These "subtle signs" include: (1) a disproportionate award to counsel, (2) a "clear sailing" arrangement for attorneys' fees, and (3) arrangements where fees not awarded revert to defendant rather than the class fund. *See id*. Each sign is present here.

#### 1. Attorneys' Fees

Plaintiffs seek attorneys' fees not to exceed 33.33 percent of the gross settlement amount, approximately $600,000. Mot. at 29. This fee amount is above the benchmark for this circuit. *See In re Easysaver Rewards Litig.*, 906 F.3d 747, 754 (9th Cir. 2018) (noting 25 percent benchmark typically used in the Ninth Circuit). The court reserves judgment and notes counsel may ultimately request, and must adequately support to stand a chance of approval, an upward departure from the 25 percent benchmark at any final approval phase. *See Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir. 2000) (explanation necessary when district court departs from 25% benchmark).

#### 2. Clear Sailing Provision

The settlement includes a clear sailing provision in which NorthStar "agrees not to object to [attorneys'] fee, cost or expense applications" that do not exceed 33.33 percent of the gross settlement amount. Settlement § IV.7. This provision raises a red flag, as in all such cases with this kind of agreement.

Should plaintiffs renew their motion and again include a clear sailing provision, and should the court approve of that renewed motion, the court ultimately will conduct "a lodestar cross-check" in the final fairness hearing to determine whether the request is reasonable. *See Ogbuehi v. Comcast of Cal./Colo./Fla./Or., Inc.*, 303 F.R.D. 337, 352 (E.D. Cal. 2014). Accordingly, the court will require plaintiffs' counsel's application for attorneys' fees to be accompanied by detailed

22

descriptions of tasks completed, hours spent on each task, who performed the work, each person's hourly rate and the total number of hours worked.

### 3. Reversion Provisions

Bluetooth warns courts to be wary of a "kicker" provision under which "all [attorneys'] fees not awarded would revert to defendants rather than be added to the cy pres fund or otherwise benefit the class," which "amplifies the danger of collusion already suggested by a clear sailing provision." In re Bluetooth, 654 F.3d at 947, 949. There is no such issue here, at least as to attorneys' fees. See Settlement § IV.7 (providing attorneys' fees and expenses not awarded "shall revert to the Net Settlement Amount and be distributed to the Class Members"). But courts are also wary of settlement agreements that would return all unclaimed settlement funds to the defendant. See Trout v. Meggitt-USA Servs., Inc., No. 216CV07520ODWAJW, 2018 WL 1870388, at *6 (C.D. Cal. Apr. 17, 2018) (noting such reversionary provisions are "strongly disfavored" and parties must satisfactorily "explain why those funds should revert") (citations omitted).

Under the settlement, if 30 percent or more of the California Class members opt-out, the portion of the net settlement amount that would have been paid to those members will be returned to NorthStar. Settlement § VI.4. Similarly, although NorthStar guarantees payment of 50 percent of the FLSA fund, funds for FLSA Group members who do not opt-in will be returned to NorthStar, provided the 50 percent payment is satisfied. Settlement § VII.6. This, too, signals potential unfairness and gives the court pause, though the court notes such provisions are frequently deemed acceptable when justified. See Nur, 2016 WL 3039573, at *3. Plaintiffs only briefly address the reversionary provision, arguing it is necessary to "recogni[ze] that Defendant is not receiving a release." Mot. at 14; Settlement § VI.4; VII.6. To gain ultimate approval, the proposed terms will need to be more fully explained and justified to eliminate the court's concerns.

## IV. CONCLUSION

In light of the foregoing analysis, plaintiffs' motion to amend, ECF No. 28, and motion to certify class, ECF No. 33, are MOOT. The court resolves ECF No. 39 as follows: it GRANTS plaintiffs' motions for preliminary certification of the Rule 23 Class, to appoint class

counsel, and for preliminary certification of the FLSA Group but DENIES plaintiffs' motion for preliminary approval of the settlement. The court is mindful of the strong judicial policy favoring settlements and the denial is without prejudice to plaintiffs renewing their motion and addressing the issues identified herein. Finally, the court initially scheduled "a further status conference to schedule the balance of the case once class certification is decided," ECF No. 18, and has since rescheduled that conference multiple times while these motions were pending. The court VACATES the status conference set for January 25, 2019. The parties are ORDERED to meet and confer as to further motions and/or scheduling necessary in this case and shall file a joint status report within 21 days of this order.

IT IS SO ORDERED.

DATED: January 22, 2019.

_____
UNITED STATES DISTRICT JUDGE